## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA

                                                    Crim. No. 24-118 (JRT/LIB)

                              Plaintiff,

v.

                                          **MEMORANDUM OPINION AND ORDER**
JENNIFER MARIE STATELY,                      **ADOPTING REPORT &**
                                              **RECOMMENDATION**

                              Defendant.

---

Garrett S. Fields and Rachel Lynn Kraker, **UNITED STATES ATTORNEY'S OFFICE**, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Plaintiff.

Paul C. Engh, 150 South Fifth Street, Suite 2860, Minneapolis, MN 55402, for Defendant.

Defendant Jennifer Marie Stately objects to parts of the Report and Recommendation ("R. & R.") of United States Magistrate Judge Leo I. Brisbois issued on August 7, 2025. Specifically, Stately objects to the denial of her Motion to Suppress Statements (Docket No. 41) and Motion to Suppress Searches and Seizures (Docket No. 42). Because the statements Stately seeks to suppress were not the product of custodial interrogation and therefore not subject to *Miranda*, because Stately's stop and the subsequent inventory search of her vehicle were lawful, and because each of the four search warrants were supported by probable cause or alternatively fall within the *Leon*

good-faith exception, the Court will overrule Stately's objections, adopt the Magistrate Judge's R. & R. in full, and deny Stately's Motions to Suppress.

## BACKGROUND

### I.    FACTS

In May 2024, a grand jury indicted Stately on various counts of murder, arson, and child neglect.[1]  (Indictment, May 1, 2024, Docket No. 9.)  The following account of the events leading to Stately's arrest is drawn from: (1) testimony given at an October 23, 2024 motion hearing by Todd County Sheriff's Deputy, Tyler Winkels (Tr. of Mots. Hr'g ("Tr."), Nov. 11, 2024, Docket No. 52); (2) affidavits submitted by the United States in support of multiple search warrants (Gov't's Exs. 3, 4, 5, 6); (3) video footage obtained from Deputy Winkels's body and squad car cameras (Gov't's Exs. 1, 2); and (4) the parties' memoranda of law (Def.'s Mem. Supp. Mot. Suppress ("Def.'s Mem.), Nov. 26, 2024, Docket No. 55; Gov't's Mem. Opp. Mot. Suppress ("Gov't's Mem."), Dec. 17, 2024, Docket No. 60.)

---

[1] Count 1: Premeditated Murder as to Minors A and B, in violation of 18 U.S.C. § 1111(a); Count 2: Murder in the Course of Committing Child Abuse as to Minors A and B, in violation of 18 U.S.C. § 1111(a); Count 3: Murder in the Course of Committing Arson as to Minor B, in violation of 18 U.S.C. § 1111(a); Count 4: Arson, in violation of 18 U.S.C. § 81; Count 5: Felony Child Neglect as to Minor C, in violation of U.S.C. §§ 1151, 1153(a), and 1153(b) and Minn. Stat. § 609.378, subd. 1(a)(1).

### A.     Events of March 15, 2024

On March 15, 2024, at approximately 2:39 p.m., the Red Lake Tribal Police Department received a 911 call reporting a house fire at 14320 Circle Pines Road, Red Lake, Minnesota, which is located within the Red Lake Indian Reservation.  (Gov's Ex. 3 ("Ex. 3") ¶ 1.)  The caller stated that they witnessed Stately leaving the residence in a Chevy Equinox bearing Red Lake registration number 33509.  (*Id.* ¶ 2.)  The Red Lake Police Department and Red Lake Fire Department arrived at the residence and witnessed smoke coming out of the house.  (*Id.* ¶ 3.)  A firefighter entered the home, discovered a deceased body, and immediately notified Red Lake Criminal Investigator Stephen Dow.  (*Id*. ¶¶ 3– 4.)  Investigator Dow arrived, entered the home, and discovered the bodies of two deceased children ("Minor Victim 1" and "Minor Victim 2") that he believed to be males between the ages of three and five years old.  (*Id*. ¶ 5.)  Minor Victim 1 was found face down wearing a blue shirt.  (*Id*. ¶ 6.)  Minor Victim 2 was found on his back on top of Minor Victim 1 with his arms stretched above him.  (*Id*. ¶ 7.)  Minor Victim 2 was not wearing a shirt, and Investigator Dow observed a laceration in the middle of his chest consistent with a stab wound.  (*Id*.)  Investigator Dow observed that both victims had blood exiting their nose and mouth.  (*Id*. ¶¶ 6–7.)  Red Lake Criminal Investigator Geoffrey Pierre photographed the inside of the residence to document the scene.  (*Id*. ¶ 8.)  Later, the Red Lake Fire Department discovered a can of lighter fluid on a concrete platform extending from the back of the house.  (*Id*. ¶ 9.)

The Red Lake Police Department, the Federal Bureau of Investigation, and the Minnesota Bureau of Criminal Apprehension deduced through investigation that Stately likely had a three-year-old male ("Minor Victim 3") in her custody. (*Id*. ¶ 10.) Because law enforcement was concerned about the well-being of Minor Victim 3, law enforcement issued an Amber Alert indicating that officials were searching for Minor Victim 3 and Stately and that Stately was last seen driving an Equinox with registration number 33509. (*Id*. ¶ 12.)

### B.     Stately's Stop and Arrest on March 15, 2024

That same day, around 9:00 p.m., Deputy Winkels received the Amber Alert. (Tr. at 20–21.) Soon after, Deputy Winkels was informed that a citizen had made a 911 call stating that they believed they saw the Equinox described in the Amber Alert. (Tr. at 21.) The caller stated that they had witnessed the Equinox at a gas station, and told the dispatcher that they would follow the vehicle and keep the dispatcher apprised of its location. (*Id*. at 22.) Deputy Winkels began pursuit of the Equinox while receiving location updates from the dispatcher, and ultimately located the Equinox driving near Lake Charlotte, between the cities of Long Prairie and Sauk Centre. (*Id*. at 24.) Deputy Winkels began driving behind the vehicle and identified that its license plate matched the one described in the Amber Alert. (*Id*. at 25.) The vehicle pulled over. (*Id*.)

Long Prairie Police Officer Trevor Larson, who was also pursuing the Equinox, pulled his car in front of Stately's, thereby "boxing that vehicle in." (*Id*. at 28.) Officer Larson stepped out with his gun drawn, which prompted Deputy Winkels to also approach

-4-

Stately's vehicle with his firearm drawn. (*Id*. ) Deputy Winkels observed Stately in the front seat and ordered Stately out of the vehicle at gunpoint. (*Id*. at 28.) The officers observed that Minor Victim 3 was in the back seat of the Equinox. (*Id.* at 29.) Deputy Winkels recalled that Minor Victim 3 had blisters on his hands and face. (*Id.* at 32.) Deputy Winkels could also smell a strong scent of body odor coming from Minor Victim 3, and the child seemed to have not been bathed for some time. (*Id.* at 32.) Stately followed Deputy Winkels's instructions, stepped out of the vehicle, and laid down on the ground. (*Id*. at 28.) Stately was detained with handcuffs and placed in the back of Deputy Winkels's squad car. (*Id*. at 31.) By this time, several other law enforcement officers from Todd County, Long Prairie Police, Stearns County, and the State Patrol were also on the scene. (*Id.* 22–24.)

Deputy Winkels and other officers searched the Equinox, and did not find any weapons or any evidence of a crime in the vehicle. (*Id*. at 31–33.) Officers subsequently towed and impounded the Equinox. (Ex. 3 ¶ 16.)

While Stately was in Deputy Winkels's squad car, Officer Larson approached the vehicle and asked, "what happened tonight?" (Def.'s Mem. at 3; Tr. at 41–42.) Stately

responded, and Officer Larson left the vehicle.[2]  Some time later,[3] a part-time Long Prairie

Officer, Cody Vail, approached the vehicle and informed Stately that "at the request of . . .

the FBI . . . we're going to have to keep you and your son separated for now."  (Ex. 1.)  This

statement initiated a dialogue lasting approximately three minutes, in which Stately

expressed her objection to Minor Victim 3 being placed in a foster home, and Officer Vail

explained that the officers had no choice but to separate Stately and Minor Victim 3

because Stately was being taken to jail.  (Ex. 1.)

Deputy Winkels then transported Stately to the Todd County Jail.  (Tr. 35.)  The

drive took between 15 and 20 minutes.  (*Id.*)  Once they arrived at the jail, Stately began

speaking to Deputy Winkels.  (Ex. 2.)  Deputy Winkels states he did not ask Stately any

questions to prompt her statements and immediately turned on his body camera to

document the exchange.  (Tr. at 36.)  Stately told Deputy Winkels that "last night,

someone broke into my house after they were bouncing a basketball around my whole

house, and I don't know what else they were doing out there . . . ."  (Ex. 2.)  Deputy Winkels

responded, "and that was up in Red Lake?  And last night?"  (*Id.*)  Stately indicated her

agreement and continued, "last night . . . I was trying to stay awake for as long as I could

---

[2] Because the United States conceded that they would not use Stately's statements made in response to the question "What happened tonight?" in its case-in-chief, the Magistrate Judge determined that the Defendant's motion to suppress as to those statements was moot.  (R. & R. at 15 n.16, Aug. 7, 2025, Docket No. 73.)  Stately did not object to that conclusion.

[3] It is unclear from the evidence available to the Court how much time elapsed between Stately's exchange with Officer Larson and Officer Vail.

so they didn't break in.  And I got scared and I was like, okay, it's just me and my kids here, there's nothing that like . . . I don't know who this is . . . ."  (*Id.*)  At that point, two other officers entered the room, and Stately stopped speaking.  (*Id.*)

### C.    Search Warrant Applications

#### 1.    The Equinox

Following Stately's arrest, the Equinox remained in the custody of the Todd County Sheriff's Office.  (Ex. 3 ¶ 16.)  On March 16, 2024, Special Agent Ryan Nilson of the FBI applied for a search warrant to search the Equinox.  (*Id.* at 4.)  The warrant was supported by an affidavit by Special Agent Nilson setting forth the facts of Stately's arrest and law enforcement's investigation to that point.  (*Id.* ¶¶ 1–16.)  United States Magistrate Judge Elizabeth Cowan Wright issued the search warrant later that day.  (*Id.* at 4.)

#### 2.    Cell Phones and DVR Device

On March 17, 2024, FBI Special Agent Bradley Klag applied for a search warrant to search four cell phones and a digital video recorder ("DVR") security device found in Defendant's home.  (Ex. 4 ¶ 6.)  Special Agent Klag submitted an affidavit detailing the facts relating to the investigation obtained to that point, and he further stated that based on his training, experience, and investigation, "agents believe each of the devices . . . will contain evidence of harms committed against" the Minor Victims.  (*Id.* ¶ 16.)  Judge Wright signed the search warrant later that day.  (*Id.* at 14.)

### 3. Facebook and Facebook Messenger

When law enforcement searched Stately's cell phone, they discovered that she had an active Facebook Messenger account. (Ex. 5 ¶ 22.) On March 20, 2024, Special Agent Klag applied for an additional search warrant to access Stately's Facebook and Facebook Messenger accounts. (*Id.* at 1.) Klag's supporting affidavit stated, "from my training and experience, I know that Facebook communications and postings tend to demonstrate the individual's day-to-day movements, patterns of life, and mental and emotional state." (Ex. 5. ¶ 24.) Special Agent Klag also stated he knew from "training and experience that Facebook Messenger is a common alternative to text message communication, particularly where cell phone reception may be inconsistent such as on the Red Lake Indian Reservation." (Ex. 5 ¶ 23.) United States Magistrate Judge Jon T. Huseby signed the search warrant that day. (Ex. 5 at 16.)

### 4. Cell Phone Tower Data

On April 15, 2024, FBI Special Agent Nicole Lopez applied for a search warrant for cell phone tower data for the towers next to Stately's residence, from March 14, 2024, at 12:00 a.m. through March 15, 2024, at 6:00 p.m. (Ex. 6., Attach. A.) Special Agent Lopez submitted an affidavit to support the warrant describing the investigation and stating that based on Lopez's "training and experience . . . information obtained from cellular service providers . . . can be used to show that the device was in the general vicinity of the cell tower at the time the communication occurred. Thus, the records [sought] . . . will identify the cellular devices that were in the vicinity of the relevant location(s) at the times

the crimes occurred." (Ex. 6 ¶ 31.) Judge Huseby signed the warrant that day. (Ex. 6 at 12.)

## II.  PROCEDURAL HISTORY

The parties filed various pretrial discovery motions,[4] and Magistrate Judge Leo I. Brisbois issued an R. & R. (R. & R., Aug. 7, 2025, Docket No. 73.) As relevant here, the R. & R. recommended denying Stately's motion to suppress her statements made in the back of Deputy Winkels's squad car and at the Todd County Jail (Def.'s Mot. Suppress Statements, Sept. 30, 2024, Docket No. 41), and Stately's motion to suppress the fruits of her arrest and the subsequent search of her vehicle, as well as the fruits of the four search warrants (Def.'s Mot. Suppress Searches and Seizures, Sept. 30, 2024, Docket No. 42).

Stately timely objected to the Magistrate Judge's recommendation on these two motions. (Def.'s Objs., Aug. 21, 2025, Docket No. 74.) Stately did not object to any other recommendations in the R. & R.

---

[4] (Def.'s Mot. Disc., Sept. 30, 2024, Docket No. 36; Def.'s Mot. Compel, Sept. 30, 2024, Docket No. 37; Def.'s Mot. Retain Rough Notes, Sept. 30, 2024, Docket No. 38; Def.'s Mot. Disclosure of Rule 404(b) Evid., Sept. 30, 2024, Docket No. 39; Def.'s Mot. Disclosure, Sept. 30, 2024, Docket No. 40; Def.'s Mot. Suppress Statements, Sept. 30, 2024, Docket No. 41; Def.'s Mot. Suppress Searches and Seizures, Sept. 30, 2024, Docket No. 42; Gov't's Mot. Disc., Sept. 30, 2024, Docket No. 44.)

**DISCUSSION**

## I.    STANDARD OF REVIEW

Upon the filing of a report and recommendation by a magistrate judge, "[a] party may serve and file specific written objections to the proposed findings and recommendations." D. Minn. LR 72.2(b)(1). "The objections should specify the portions of the magistrate judge's report and recommendation to which objections are made and provide a basis for those objections." *Mayer v. Walvatne*, No. 07–1958, 2008 WL 4527774, at *2 (D. Minn. Sept. 28, 2008). For dispositive motions, the Court reviews de novo "properly objected to" portions of an R. & R.[5] D. Minn. LR 72.2(b)(3); *see also* 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(c). Because Stately's motions to suppress are dispositive, the Court will review the Magistrate Judge's determinations de novo. *See* D. Minn. LR 72.1(a)(3)(A).

## II.    ANALYSIS

The Court now turns to Stately's objections to the denial of her motions to suppress. Although the Fourth and Fifth Amendments contain no provisions excluding the use of evidence obtained in violation of their commands, decisions of the U.S.

---

[5] In civil cases, "[o]bjections which are not specific but merely repeat arguments presented to and considered by a magistrate judge are not entitled to de novo review, but rather are reviewed for clear error." *Montgomery v. Compass Airlines, LLC*, 98 F. Supp. 3d 1012, 1017 (D. Minn. 2015). It is unclear whether this rule applies in the criminal context. *See United States v. Chopra*, No. 19-305, 2021 WL 347415, at *1 (D. Minn. Feb. 2, 2021). Because the Eighth Circuit has not weighed in on the proper standard of review and because Stately's objections would fail under either standard, the Court will review the R. & R. de novo.

Supreme Court have "establish[ed] an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009). Here, Stately seeks to suppress evidence she alleges was obtained in violation of the Fourth and Fifth Amendments. The Court will address each of Stately's suppression arguments in turn.

### A.      Stately's Motion to Suppress Statements

First, the Court considers Stately's motion to suppress two sets of statements made on the day of her arrest.

The Fifth Amendment's Self-Incrimination Clause provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona* the Supreme Court "concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be 'accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself.'" *Dickerson v. United States*, 530 U.S. 428, 435 (2000) (alteration in original) (quoting *Miranda*, 384 U.S. at 439)). The Supreme Court therefore laid down the now-familiar "concrete constitutional guidelines" necessary to protect "basic" and "precious" constitutional rights, such as the right against self-incrimination: A court may not admit into evidence any statement given during a custodial interrogation of a suspect unless law

enforcement first provided the suspect with the now well-known *Miranda* warnings. 384 U.S. 436, 442 (1966).

*Miranda*'s protections are in effect "whenever a suspect is (1) interrogated (2) while in custody." *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990). But statements "given freely and voluntarily without any compelling influences" are not subject to *Miranda*—and are therefore admissible, even if made while in custody— because the "fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be **interrogated**." *Miranda*, 384 U.S. at 478 (emphasis added). "Interrogation" in the *Miranda* context encompasses "express questioning . . . [and] any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

### 1.    Squad Car Statements

As described above, after Stately was arrested officers escorted her to the backseat of Deputy Winkels's squad car. Officer Vail then approached the vehicle to inform Stately that "at the request of . . . the FBI . . . we're going to have to keep you and your son separated for now." (Ex. 1.) This statement initiated a back-and-forth in which Stately expressed her objection to Minor Victim 3 being placed in a foster home, and Officer Vail explained that Stately would be "going to be going to jail, and there's no way that your son is going to be with you in jail." (Ex. 1.)

Stately seeks to suppress her statements made during this dialogue.  Specifically, she seeks to suppress any statements that could be interpreted as placing her at the crime scene in Red Lake.  (Def.'s Objs. at 7.)  Stately argues that she "was responding to an earlier question," by Officer Larson, who had asked her "what happened tonight," after officers executed the traffic stop of Stately's car.  (*Id.*)  Stately argues that her later statements to Officer Vail were therefore the product of custodial interrogation without the requisite warnings.

It is undisputed that Officer Vail did not provide Stately with *Miranda* warnings before their conversation and that Stately was in custody during that time.  The admissibility of Stately's statements thus turns on whether they were the product of "interrogation," or whether her statements were "voluntary," and thus admissible despite the lack of prior *Miranda* warnings.

After carefully reviewing the video footage of the exchange between Stately and Officer Vail (*see* Ex. 1), the Court concludes that Stately's statements in the squad car were the product of neither express questioning nor actions by Officer Vail that were reasonably likely to elicit an incriminating response.  It is well-settled that "custodial statements made on the suspect's own initiative are not subject to the safeguards of *Miranda*," *Butzin v. Wood,* 886 F.2d 1016, 1018 (8th Cir. 1989), and that "[v]olunteered statements of any kind are not barred by the Fifth Amendment," *Miranda*, 384 U.S. at 478.  Although Stately was in police custody, which is an inherently coercive environment,

interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Innis*, 446 U.S. at 300. While it is true that Officer Larson had asked Stately a question earlier, Stately's interaction with Officer Larson had ended.[6] When Officer Vail approached Stately and informed her of Minor Victim 3's location, he asked no questions and made no statements that would be reasonably likely to elicit an incriminating response from Stately. The camera footage reveals that Officer Vail's statements throughout the exchange were limited solely to the topic of where Minor Victim 3 would be taken, and Officer Vail never asked Stately any questions concerning the evening's events.

The Court finds no evidence that Officer Vail engaged in conduct reasonably likely to elicit incriminating responses from Stately. Stately's statements were therefore not the product of custodial interrogation and thus fall outside of *Miranda*'s protections. Accordingly, the Court will deny Stately's Motion to Suppress the statements made in the back of Deputy Winkels's squad car.

### 2.    Statements at Todd County Jail

Stately also moves to suppress her statements to Deputy Winkel at the Todd County Jail. Specifically, she seeks to suppress any statements relating to "basketballs

---

[6] Seeming to concede that Officer Larson's question to Stately constituted custodial interrogation without prior *Miranda* warnings, the United States has indicated they will not be utilizing any statements made by Stately in response to the question "what happened tonight?" in its case-in-chief.

bouncing outside her house, and her efforts at securing help from the Bemidji and Red Lake Police Departments." (Def.'s Mem. at 10.) Stately does not point to any action or statement by Deputy Winkels at the jail that elicited these statements from Stately. Rather, Stately—relying on the case *Missouri v. Seibert*, 542 U.S. 600 (2004)—argues that "law enforcement, acting collectively, did not 'punctuate' the first interrogation of Ms. Stately, which began with 'what happened tonight,' with her disclosures at the jail of what did." (Def.'s Mem. at 10.)

*Seibert* involved officers engaging in a concerted "technique of interrogating in successive, unwarned and warned phases"—one officer, without providing *Miranda* warnings, would aggressively interrogate the suspect, and then another officer, after providing warnings, would utilize their knowledge of the suspect's unwarned statements to elicit incriminating responses that would then be admissible in court. *Seibert*, 542 U.S. 610. The Supreme Court held that "*Miranda* warnings . . . inserted in the midst of coordinated and continuing interrogation" are "likely to mislead and 'deprive a defendant of knowledge essential to [their] ability to understand the nature of his rights and the consequences of abandoning them.'" *Id.* at 613–14 (quoting *Moran v. Burbine*, 475 U.S. 412, 424 (1986)).

This case is vastly different than *Seibert*. Stately's conversation with Deputy Winkels at the Todd County Jail began with her own voluntary statements and was not initiated through police questioning. (*See* Ex. 2.) By the time the exchange took place,

her brief interactions with Officer Larson and Officer Vail had long since concluded, and Stately presents no evidence of any coordination or communication between the three officers. The Court rejects the contention that these separate exchanges constituted one continuous interrogation process intended to circumvent *Miranda*. *See Seibert*, 542 U.S. at 613.[7]

The Court therefore will deny Stately's motion to suppress her statements at Todd County Jail.

**B.      Stately's Motion to Suppress Searches and Seizures**

**1.      Traffic Stop and Search of Stately's Vehicle**

The Court now turns to Stately's motion to suppress the fruits of various searches. Stately first moves to suppress evidence stemming from her arrest by challenging the traffic stop following the Amber Alert, and the ensuing inventory search of the Equinox, as unlawful under the Fourth Amendment.

The Fourth Amendment, made applicable to the States by the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643 (1961), guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches

---

[7] Considering Stately's statements at the Todd County Jail independently, the Court further concludes that Stately's remarks were beyond the protections of *Miranda* because "*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." *Wood*, 886 F.2d at 1018 (quoting *United States v. Rhodes*, 779 F.2d 1019, 1032 (4th Cir. 1985)) (internal quotation marks omitted).

and seizures."  U.S. Const. amend. IV.  "If officers possess a reasonable suspicion of criminal activity, they may briefly detain a suspect to investigate the possible criminal activity, even though there is no probable cause for an actual arrest."  *United States v. Hernandez–Hernandez,* 327 F.3d 703, 706 (8th Cir. 2003) (citing *Terry v. Ohio,* 392 U.S. 1, 22 (1968)).  "The officer's suspicion is reasonable if the officer knows particularized, objective facts that lead to a rational inference that a crime is being or has been committed."  *Id.*  "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances."  *United States v. Garcia,* 23 F.3d 1331, 1334 (8th Cir. 1994).

The Court concludes that the officers who stopped Stately had a reasonable, articulable suspicion sufficient to support the stop.  The officers had received an Amber Alert identifying Stately as a suspect in a double homicide and an ongoing child abduction and stating that she was driving a black Chevy Equniox bearing the license plate number 33509.  (Ex. 7.)  While Stately argues that "no driving violation was observed that could ordinarily justify her felony arrest," (Def.'s Objs. at 4), the Supreme Court has held that an officer's reasonable suspicion of a completed felony can support a *Terry* stop.  *See United States v. Hensley*, 469 U.S. 221, 229 (1985) ("[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be

made to investigate that suspicion.").  When the officers found Stately's Equniox on the road, they possessed a reasonable articulable suspicion not only that Stately was in the process of committing a crime, but had committed a completed crime.

Turning to the inventory search of the Equinox following Stately's arrest, the Court first emphasizes that it does not appear that the United States obtained any evidence from this search that would be suppressed even if the Court were to determine the search is unlawful.  But even if there were, the inventory search was lawful.

"As with any warrantless search, the Government bears the burden of demonstrating the need for an exemption from the warrant requirement and that its conduct fell within the bounds of the exception."  *United States v. Kennedy,* 427 F .3d 1136, 1144 (8th Cir. 2005).  Here, the search was supported by the inventory search exception to the warrant requirement of the Fourth Amendment, which "permits law enforcement to inventory the contents of a vehicle that is lawfully taken into custody, even without a warrant or probable cause to search."  *United States v. Garreau*, 658 F.3d 854, 857 (8th Cir. 2011.)  Because law enforcement lawfully took Stately's vehicle into custody after her arrest, the accompanying inventory search was also lawful.[8]

---

[8] The Court again emphasizes that it appears the United States is not seeking to admit any evidence resulting from this inventory search.

### 2. Search Warrants

Stately also moves to suppress evidence obtained pursuant to four search warrants issued in March and April 2024. These search warrants were for: (1) Stately's Chevy Equinox (*see* Ex. 3); (2) four cell phones and a DVR security device found in Stately's home (*see* Ex. 4); (3) Stately's Facebook and Facebook Messenger accounts (*see* Ex. 5); and (4) cell tower records for the cell towers nearest to Stately's home (*see* Ex. 6).

The Fourth Amendment requires that search warrants be supported by probable cause. U.S. Const. amend. IV. The existence of probable cause is based on whether, given all the circumstances set forth in the warrant application, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The issuing judge therefore must consider the totality of the circumstances. *Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir. 1998). When a search warrant is based solely on an affidavit, courts may consider only "information which is found within the four corners of the affidavit" to determine the existence of probable cause. *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (citation omitted). "The affidavit 'should be examined under a common sense approach and not in a hypertechnical fashion.'" *Id.* (quoting *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)). Although the Court reviews the R. & R. de novo, the Court must afford "great deference" to the probable cause finding of the judge who issued the warrant. *United States v. Butler*, 594 F.3d 955, 962 (8th Cir. 2010) (citing *Gates*, 462 U.S. at 236). The Court must uphold the probable cause determination if the issuing judge had a substantial basis

for the initial probable cause finding.  *United States v. Horn*, 187 F.3d 781, 785 (8th Cir. 1999).

### (i)    Warrant to Search Vehicle

First, Stately argues that the affidavit supporting the search warrant for the Equinox did not establish probable cause that evidence of a crime could be discovered in the vehicle.  The Court disagrees.

A valid search warrant must provide evidence of a "nexus between a particular location and [illegal activity]," which must be "determined by the nature of the crime and the reasonable, logical likelihood of finding useful evidence."  *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016).    The Court concludes that Special Agent Nilson's supporting affidavit provided sufficient factual details to connect the Equinox to the alleged crimes.  (*See* Ex. 3.)  The affidavit recounted that Stately was seen leaving her burning residence in the Equinox on the afternoon of March 15, 2024 (*Id.* ¶¶ 2–3), and that upon arriving at the home, law enforcement confirmed that the house was on fire and found two deceased children inside the home, with wounds consistent with a possible homicide (*Id.* ¶¶ 5–7).  When the Equinox was ultimately stopped, officers observed Stately and Minor Victim 3, who appeared to have a swollen face and red stains on his clothing resembling blood, in the vehicle.  (*Id.* ¶¶ 13–15.)

Because the affidavit supporting the search warrant provided weighty evidence of the vehicle's connection to the alleged crimes—particularly the observed presence of

Minor Victim 3 in the vehicle with potential wounds and blood stains at the time of the traffic stop—the Court concludes that the issuing judge had a substantial basis for concluding that there was a fair probability the Equinox contained evidence of a crime. The Court will therefore deny Stately's motion to suppress.

### (ii)    Warrant for Electronic Devices

Stately next moves to suppress the fruits of the search and seizure warrant for four cell phones and a DVR security device, all of which were found in Stately's home. Stately argues that the supporting affidavit lacked evidence to prove that these devices would contain any evidence of the alleged crimes. Specifically, Stately argues that the United States provided no facts showing that these devices were used in connection with the harms committed against Minor Victims 1, 2, or 3. (Def.'s Objs. at 10–11.)

The Court will again deny Stately's motion to suppress. A search warrant application need only provide evidence of a "nexus between a particular location and [illegal activity]," as "determined by the nature of the crime and the reasonable, logical likelihood of finding useful evidence" in the place to be searched. *Etheridge*, 165 F.3d at 657. The affidavit supporting the search warrant stated that the five devices were found inside Stately's fire-damaged home, in which Minor Victim 1 and Minor Victim 2 were found deceased. (Ex. 4 ¶¶ 5–9, 17.) Given Special Agent Klag's experience, he attested in his supporting affidavit that it was likely the devices would contain evidence of harms committed against the victims. (Ex. 4 ¶ 16.) While a closer question, the Court concludes

that the presence of the cell phones and the recording device in the home where these crimes occurred provided the issuing judge with a substantial basis to conclude that probable cause existed to support the search.

But even if the Court were to find that the search warrant was not supported by probable cause, the Court would nevertheless deny Stately's motion to suppress because the officers' actions fell within the *Leon* good-faith exception. *See United States v. Leon*, 468 U.S. 897, 922–23 (1984).

The good-faith exception bars application of the exclusionary rule "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *United States v. Fiorito*, 640 F.3d 338, 345 (8th Cir. 2011) (quoting *Leon*, 468 U.S. at 920). In other words, "[i]n cases of good faith, the evidence, although seized pursuant to a warrant that lacked probable cause, nonetheless is admissible at trial." *Id.* In such cases, evidence is only excluded: (1) when the affidavit supporting the search warrant contains a knowing or reckless falsity; (2) when the issuing magistrate judge wholly abandoned his or her judicial role; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; or (4) when the warrant is so facially deficient that it cannot reasonably be presumed valid. *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006) (citing *Leon* 468 U.S. at 923).

This case does not fall within any of those categories. If the Court were to determine that the search warrant was not supported by probable cause, the warrant was not lacking such that the officers' reliance on it was objectively unreasonable—nor does Stately allege that the warrant contained "falsit[ies]" or that the issuing judge "wholly abandoned" their judicial role. *See Leon*, 468 U.S. at 914–923. For all these reasons, Stately's motion to suppress will be denied.

### (iii)    Warrant for Facebook and Facebook Messenger Accounts

Stately further moves to suppress the fruits of the warrant authorizing the search of her Facebook and Facebook Messenger accounts. Like the warrant for the electronic devices, Stately argues that this warrant was unsupported by any specific facts tying her alleged criminal activity to the Facebook accounts. Stately argues that Special Agent Klag's statement that individuals living on the Red Lake Reservation use Facebook Messenger for day-to-day communication due to the lack of cell reception "could be used to search anyone's account, because Facebook Messenger is used by the innocent to communicate, and may show the remnants of a lived life." (Def.'s Objs. at 12.)

The Facebook warrant presents a closer question than the previous warrants. But regardless of the Court's conclusion on the question of probable cause, this warrant too falls within the scope of the *Leon* good-faith exception. Stately has presented no evidence that the officers involved acted with anything but objective good faith in obtaining the search warrant for the Facebook accounts. *See Leon*, 468 U.S. at 920. Nor is there any

allegation that the supporting affidavit contained falsities. *Id.* at 923. Given the factual narrative recounted in the search warrant application, the Court finds that the issuing judge did not abandon their judicial role in authorizing the search, and finds that the affidavit was not "so lacking in indicia of probable cause" that law enforcement could not have reasonably believed that probable cause existed. *Id.* Nor was the warrant "so facially deficient" that officers could not have reasonably presumed it to be valid. *Id.* The Court will therefore deny Stately's motion to suppress.

**(iv)   Cell Tower Data**

Finally, Stately moves to suppress the fruits of the warrant authorizing law enforcement to obtain cell tower data from the night of Stately's arrest, arguing that "[t]he evidence secured by this warrant is premised . . . upon the seizure of . . . Stately's phones from her person. Our claim is one of taint from that initial search and seizure." (Def.'s Objs. at 12.)

First, the Court reiterates its conclusions above that the stop and arrest of Stately, the inventory search of Stately's vehicle, and the execution of the warrant for the five electronic devices in Stately's home were lawful. Second, the Court concludes that the search warrant for cell tower data was supported by probable cause. The Eighth Circuit has held that when there is "'a fair probability' that records from nearby [cell] towers [will] reveal incriminating evidence," a search warrant for such records is supported by probable cause. *United States v. James*, 3 F.4th 1102, 1105 (8th Cir. 2021). Special Agent

-24-

Lopez's supporting affidavit stated: that an individual had called 911 on the day the alleged crimes occurred to report that they saw Stately leaving her home (Ex. 6. ¶¶ 5–6); that a "Chevy Equniox matching the description of Stately's vehicle was captured on a neighbor's home surveillance camera" that afternoon (*id.*¶ 7); that the Equinox was seen returning to Stately's home once first responders had arrived, but that the vehicle "quickly drove away before anyone could speak with her" (*id.* ¶ 9); and that Stately was ultimately arrested after being stopped in the Equinox, with Minor Victim 3 in the backseat (*id.* ¶ 20).

The Court concludes that these facts, which represent only a part of the evidence contained in the affidavit supporting the search warrant, provided the issuing judge with a substantial basis to conclude that there was probable cause the cell towers contained evidence of the alleged crimes. And even if this warrant lacked probable cause, the Court concludes that this warrant would also be within the scope of the *Leon* good faith exception. Accordingly, the Court will deny Stately's motion to suppress.

## CONCLUSION

The Court will deny Stately's Motion to Suppress Statements and Motion to Suppress Searches and Seizures. After reviewing Stately's objections to the R. & R. de novo, the Court concludes that the two sets of challenged statements were not the product of custodial interrogation, and therefore were outside the scope of *Miranda*, and

concludes that none of the searches or seizures challenged by Stately violated the Fourth Amendment.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Jennifer Marie Stately's objections to the Report and Recommendation [Docket No. 74] are **OVERRULED**;

2. The Report and Recommendation [Docket No. 73] is **ADOPTED**; and

3. Defendant Jennifer Marie Stately's Motion to Suppress Statements [Docket No. 41] and Motion to Suppress Searches and Seizures [Docket No. 42] are **DENIED**.

DATED:  October 29, 2025
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge